NARRAGANSETT AMUSEMENT COMPANY vs. RIVERSIDE PARK AMUSEMENT COMPANY.

Middlesex. January 25, 26, 1927. — June 29, 1927.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, CARROLL, WAIT, & SANDERSON, JJ.

*Equity Pleading and Practice,* Amendment to bill; Master: report, exceptions to report, duties under rule. *Contract,* Consideration, What constitutes, Construction, Modification, In writing. *Evidence,* Competency. *Damage,* For breach of contract: prospective profits.

An amusement corporation by a bill in equity sought to enjoin a corporation which was the proprietor of an amusement park from permitting electric wires and a pole to be so maintained in the park as to interfere with the plaintiff's use of premises let to it by the defendant and for

specific performance of the contract of letting, which contained a stipulation as to the conduct of a show by the plaintiff and the collection of admissions and a share of profits by the defendant. The bill also sought damages. The suit was referred to a master. It appeared that the contract of letting was made on October 20 and provided for an exhibition by the plaintiff at the next amusement season, which began May 30; that the plaintiff was to erect a building on the space let; that difficulty arose by reason of the nearness of a pole of an electric company carrying high tension electric wires, and adjustments as to position were agreed upon between the parties; that the building was substantially completed in the fall in a position selected by such agreement; that on March 20 the electric company had "condemned the proposition" if construction was maintained at the position selected; that on May 19 the defendant tore down part of the plaintiff's building and the suit was brought on May 22. Because, due to the pending opening of the season, there was not time for hearings to result in remedy by injunction, the bill was retained solely for the assessment of damages. Before a master, without objection, evidence was introduced by both parties relating to an oral agreement by the defendant, made during the controversy in the fall as to the location of the plaintiff's building with relation to the electric light pole, that the pole would be moved in the spring, in consequence of which the plaintiff changed the position of its building, making a jog in one corner where the pole then was standing; and the master made findings to that effect. After the filing of the master's report, the plaintiff moved to amend the bill by adding the matters covered by such evidence and findings, and for damages for breach of such agreement. The motion was heard and was allowed "in order that the pleadings might conform to the proofs," the judge finding that he was satisfied that the matters embraced in the amendment had been fully heard by the master. *Held*, that

(1) Whether the amendment was to "enable the plaintiff to sustain the action for the cause for which it was intended to be brought" was a question of fact for the judge;

(2) The court has power to allow amendments at any time before final judgment;

(3) While the defendant was entitled to have the issue raised by the amendment fully and fairly tried, it was manifest from the master's report that there had been such a trial;

(4) The oral agreement found by the master and alleged in the amendment to the bill, that the plaintiff was to build around the pole and that the defendant promised to remove the pole in the spring, was upon a valid consideration;

(5) It was competent to modify or change the written agreement by a subsequent oral agreement;

(6) The agreement in writing between the parties was not to be construed as a lease, but as a contract by the terms of which the parties entered into definite stipulations, and they were thereby respectively bound; the rule, that there is no implied warranty of the condition of premises leased or that they are suitable for the use for which they were hired, had no application to the contract in question, nor was the doctrine of *caveat emptor* pertinent.

The master who heard the suit above described found that the defendant had broken its contract with the plaintiff and that thereby the plaintiff, after erecting its building, was prevented from using it. As a part of the damages, he assessed what he found to be prospective profits from the show if it had been exhibited. From other findings by the master, it appeared that no entertainment such as the plaintiff proposed had ever been given in this Commonwealth or in the vicinity of the city in question, and that the master's findings were based on evidence respecting shows, similar to the one intended by the plaintiff, conducted at so called amusement parks in Providence, Rhode Island, and Sandusky, Ohio. *Held*, that the profits assessed by the master were too conjectural and uncertain to be recovered.

The rule to the master in the suit in equity directed him "to hear the parties and their evidence, find the facts, and report to the court." He reported evidence before him as to certain findings made by him, and the defendant excepted to such findings. *Held*, that

(1) The master should not have reported the evidence or parts of it without direction by the court to do so;

(2) The findings objected to could not be said to be unwarranted and the exceptions to them must be overruled.

The only duty of the master under the rule above described was to find the facts; he was not required to make rulings of law, and exceptions to his refusal to make rulings of law must be overruled.

BILL IN EQUITY, filed in the Superior Court on May 22, 1917, and afterwards amended, to enjoin the defendant and its servants, agents and attorneys from so maintaining, or causing or permitting to be maintained, electric wires and a pole upon or so near the premises, let by the defendant to the plaintiff under the contract in writing described in the opinion, as to interfere with the plaintiff's use of the leased premises, and from in any other way hindering or molesting the plaintiff or causing or permitting it to be hindered or molested in the enjoyment of those premises; for specific performance of the contract, and for damages.

A provision of the contract relating to the term of the letting was as follows: "This agreement is to last for a period of one (1) year, that is during the amusement season of 1917 with the option of extending the lease for four (4) years more, that is during the amusement seasons of 1918, 1919, 1920, and 1921, by giving said Riverside Park Amusement Company notice of such intention at the close of each amusement season and upon the following terms: that the party of the first part [the defendant] shall have twenty-five (25) per cent

of the gross receipts." There were other provisions as to the conduct of the plaintiff's show, the collection of admissions, and a sharing of profits by the defendant.

The suit was referred to a master "to hear the parties and their evidence, find the facts, and report to the court." His report fills fifty pages of the printed record. His findings on the question of damages were as follows:

"As might be expected in a matter of this kind, it was difficult for the plaintiff to prove what its damages were, and it is difficult for me to find them. What would have happened if this contract had been carried out by the defendant in good faith is largely a matter of conjecture. This is conceded by the plaintiff. As I understand the law, however, the fact that it is difficult to estimate the damage is not a justification for refusing to estimate damages at all, and I conceive it to be my duty to apply such evidence as is presented to me to this question, and then to assess in dollars and cents the damages which I am satisfied by a fair preponderance of the evidence the plaintiff suffered. I am of the opinion that this building is valueless to the plaintiff at the present time. It has not been painted, has rusted considerably, in many places the metal being entirely rusted away. It has deteriorated rapidly, partly owing to the general character of the building, and partly owing to the exposure effected by tearing away such a large portion of the west wall of the building. On the whole I am satisfied that the plaintiff has been damaged to the entire extent of the money invested. The building cost approximately $2,000 and I find that its fair value as it stood at the time the plaintiff instituted these proceedings was that amount. The plaintiff also made the following claims for damage in addition to the cost of the building.

"An item of $130,68 for freight of the various materials, scenery, figures, etc., which it intended to install in the buildings was claimed. These figures were in storage at one of the plaintiff's shows in Ohio, and were brought on to Springfield to be installed. This seems to me to be an extra expense to which the plaintiff was put, and which has become

valueless by reason of the defendant's acts. I should there-fore allow this amount.

"The plaintiff also claims $136 for storage on these same goods in Springfield. It does not seem to me that this should be allowed as part of his damages. In the first place I am not convinced but that the storage would have been incurred in any event, even if he had been allowed to open the building, and in the second place it seems to me that the goods would have had to have been stored somewhere. Even if it should be admitted that the storage in Ohio where the plaintiff had perhaps facilities of its own for storing this property would have been less than it was in Springfield, no evidence has been submitted to me to show what the value of the storage in Ohio was, and I do not feel that I am justified in assuming that it had no value. On the whole, I am of the opinion that this item would have been incurred by the plaintiff to some degree at any rate, irrespective of this particular case.

"The plaintiff also claims $284.50 for his own and his wife's hotel bills while at Springfield in connection with the construction of the building and other matters. His wife is an officer of the company, equally interested with him, and actively engaged in its affairs. I find that the presence of both was reasonably necessary for the construction of this building. I cannot find, however, that they should be al-lowed anything for these hotel bills. It is, of course, evident that their expenses for food and lodging in some way or other would have to be borne by them, irrespective of where they were. While it is quite probable that the expenses at hotels were larger than would otherwise have been, I have no evi-dence to satisfy me how much larger they would have been, and no evidence which would justify me in finding that there was any additional charge to their ordinary living expenses. It seems to me obvious that expenses of this sort are not chargeable unless it can be shown that they were incurred especially because of this undertaking and constituted an additional charge to the plaintiff which he would not other-wise have had to incur.

"The plaintiff made six trips to Springfield during this period. Five of these were after the contract was signed,

and were in connection with the construction of the building. These trips were made in his own automobile, and he seeks to charge the sum of $10 a trip as an item of expense. It seems to me that this charge should be allowed. I find that the sum of $10 a trip was a reasonable charge for the use of an automobile to Springfield and return, and that this expense was incurred by the plaintiff in this undertaking, and if he received no return from it would constitute a loss to him. I therefore allow $50 for the trips made subsequent to the signing of the contract as an item of damage.

"The plaintiff also claims that he had to make one trip from his other show in Sandusky, Ohio, which would have been unnecessary if the defendant had performed its obligation. Whatever may be said of the propriety of this charge in other respects, I cannot allow it because I am not satisfied as a matter of fact that this trip was due to the defendant's fault. The plaintiff has not satisfied me that it was not made in the ordinary course of his business undertakings, and that it was in any way chargeable exclusively to this matter.

"The plaintiff also seeks to make a charge as an item of damages for his own time, and sets the value of $500 upon it. I find that the plaintiff exercised supervision in the construction of this building which some one would have been obliged to render, that his time was of value, and that it is a fair charge to be reckoned in the construction of the building, and I see no reason why the plaintiff corporation is not entitled to make a charge for it. I am unable to agree with the plaintiff in the price put upon it, but allow the sum of $300 for the services of the president of the plaintiff corporation in the construction of this building. . . .

"The subject of profits, . . . opens a question of great difficulty. It is conjectural to some degree as to whether this undertaking would have paid, and this uncertainty is increased by the fact that recent disturbed conditions have increased the natural hazard attendant upon an amusement enterprise. It may be that the patrons of this park would not care for the entertainment offered by the plaintiff's show and would not attend it in sufficient numbers to make it profitable. How many people would come to the park and

how many who came would attend the show is to some extent a matter of guesswork. As admission to the park was free, no evidence as to its attendance could be offered which was very accurate. On the other hand, the plaintiff corporation had had experience in this business, was conducting similar shows in other localities, and offered testimony which was admitted against the defendant's objection with regard to attendance in other localities, notably in Providence, Rhode Island, and Sandusky, Ohio. While the correspondence of the various shows maintained by the plaintiff was not absolutely accurate, it seemed to me that there was sufficient similarity in the ventures at Providence and Sandusky to make the experience there of some value to me in estimating the probable profit to be derived from this enterprise. I am satisfied by the evidence that during this same summer a show, which, as far as the amusement seeking public went, was substantially the same, produced a profit above all expenses and charges, in open air amusement parks not essentially unlike the park of the defendant, in the cities of Providence, Rhode Island, and Sandusky, Ohio, of at least $4,000. I have every reason to believe that if opened in the vicinity of Springfield, Massachusetts, and carried through the season, it would have netted its proprietors a substantial profit. I take into account that it would be a new venture in the defendant's park, and that the first season might show a decreased profit on that account. The plaintiff claims that the first season should be as good as any subsequent season owing to the fact that the entertainment is then a novelty in the particular locality in which it is situated. However this may be, I am inclined to think that the attendance would be smaller at the beginning of the season until the entertainment became established. I also take into account the fact that even if the defendant had not been at fault, I do not believe that the plaintiff's show at Springfield would have opened with the opening of the park. It does not seem to me that the plaintiff could have completed the building and got its show in place without considerable delay, for which the defendant would not be responsible. But taking all these things into consideration, I nevertheless am convinced

by a fair preponderance of the evidence that the entertainment of the plaintiff would have shown a net profit of at least $2,000 during the summer of 1917. This profit is above all charges and expenses, including an allowance for depreciation of the building which at the end of five years became the defendant's property.

"The plaintiff also contends that he is entitled to damages for each succeeding year during the life of the contract. It is to be noted that the contract provides for an option of renewal for a further term of four years after the first season of 1917, provided the plaintiff gives the defendant notice that he desires to continue the contract at the close of each season. The Narragansett Company did not give any such notice at the close of the year 1917. Whether its omission to do so under the circumstances precludes its claim for any further profits I do not find it necessary to decide. If as a matter of law under the circumstances in this case, such notice was necessary, the plaintiff did not give it, but even if the plaintiff had given such notice, I cannot find upon the facts before me that it would have made any profit. While there is no particular evidence to show that it would not, the evidence to show that it would have made a profit does not seem to me to satisfy the burden of proof. It was a difficult matter to estimate the profits for the first year, and yet I felt that the plaintiff had satisfied me that it would have made at least the amount which I have found as damages, but what would have happened in the succeeding years is open to so much conjecture that any findings that I should make passes beyond the realms of proof, and becomes mere guesswork. I cannot find after careful consideration of the evidence before me that I have any more reason to suppose that the year 1918 would have shown a profit than that it would have show a loss. So many things enter into any such computation that the result which is so largely speculative in the immediate future becomes hopelessly involved in difficulty when we take into consideration the succeeding years. I therefore find that the plaintiff has not satisfied me that it would have made a profit in any of the years 1918, 1919, 1920, or 1921, and allow it nothing for those years.

"I estimate the damages as follows:

| | |
|---|---|
| Value of building | $2000.00 |
| Freight of exhibit to Springfield | 130.68 |
| Travel to Springfield | 50.00 |
| Services of president of plaintiff Co. | 300.00 |
| | $2480.68 |
| Profits for 1917 | $2000.00 |

(Or in the alternative if profits are not to be allowed, interest from Jan. 1, 1917, to date of this report)      272.87"

Other material facts found by the master and exceptions to his report are stated in the opinion.

Further proceedings in the Superior Court before *Macleod*, J., are described in the opinion. There were entered an interlocutory decree overruling the exceptions and confirming the master's report, and a final decree directing the defendant to pay to the plaintiff $4,480.68 with interest from January 1, 1918, making $6,799.41, and costs. Both parties appealed.

The case was argued at the bar in January, 1927, before *Rugg*, C.J., *Braley, Crosby, Pierce, & Wait*, JJ., and afterwards was submitted on briefs to all the Justices.

*F. J. Johnson*, (*A. L. Taylor & E. C. Parks* with him,) for the plaintiff.

*C. W. Rowley*, (*D. J. Doherty* with him,) for the defendant.

CROSBY, J. This is a bill in equity to restrain the defendant from maintaining electric wires and a pole upon or near certain premises in such manner as will interfere with the plaintiff's use of said premises, and for other relief. The case was referred to a master. All the evidence is not reported.

The plaintiff, a New York corporation, was engaged in the "Show business" so called and maintained in various amusement parks exhibitions of wax figures, generally under the name of the Eden Muse. The defendant, a Massachusetts corporation, maintained an amusement park in Agawam, in this Commonwealth, where were conducted many entertainments common to such enterprises. By the terms of a

written contract dated October 20, 1916, the defendant agreed to rent to the plaintiff "a parcel of land measuring fifty (50) by one hundred fifty (150) feet and situated between the Greyhound Coaster and the Skating Rink DeLuxe . . . at Riverside Park," upon which the plaintiff was "to erect a building suitable for the exhibition of wax figures, said building to be in harmony with other buildings now located at the park and satisfactory" to the defendant. The exact location of the building was not defined.

The master made the following findings: In the fall of 1916 and after the contract had been executed, the plaintiff's president, one Knapp, started to put in place the foundations for the building. Because of the location of a pole to sustain electric wires of high tension, he proposed to erect the building between the pole and the "Greyhound Coaster," which would have resulted in the building being close to the coaster. The defendant's president, one Perkins, objected to this and informed Knapp that it would have to be erected nearer the skating rink; and he was also so notified by the defendant's superintendent. In accordance with this request the location of the building was moved about five feet away from the coaster. It was found that by so locating the building the sill under the west wall would run directly through the pole. This was brought to the attention of Perkins, and, after a conference, Knapp agreed to make a jog in the building around the pole, Perkins saying that "the pole would be moved in the spring anyway." The master further found that the building so located was in the position designated by the officers of the defendant; that if it had been erected in the position where first located by the plaintiff it would not have interfered with the pole carrying the high tension current, although the westerly wall would have been within a few feet of the pole. The building was substantially completed in the fall of 1916. Its side and roof were covered with sheet iron and it was found that the relative position of the building and the pole constituted a source of danger. On March 20, 1917, the defendant's president, by letter to the plaintiff's president, stated that the electric light company which furnished

light for the park had "condemned the proposition" for the reason that the building was so near the wires as to be unsafe. In reply Knapp wrote Perkins that the building was erected just where he had placed it after the plaintiff had staked out a location farther away from the pole. On May 19, 1917, the metal covering of the building near the pole was torn off and scattered about on the ground. The master found that this was done by the servants or agents of the defendant under the direction of its superintendent, or by their concurrence and acquiescence. The park was to be opened on May 30, but the plaintiff, because of the proximity of the pole and wires, was unable to occupy the building.

The bill was filed May 22, 1917, and was brought primarily to enjoin the defendant from maintaining electric wires and pole so near the leased premises as to interfere with the plaintiff's occupancy and from interfering with the use of the premises by the plaintiff, but as hearings could not be held in time to accomplish this, the bill was retained for the assessment of damages. The master's report was filed December 3, 1918; both parties excepted to the report.

On May 13, 1921, the defendant filed in the Superior Court a motion, supported by affidavits and opposed by a counter affidavit, to discharge the master's report on the ground that he was not impartial and that the findings made by him were as matter of law erroneous. The motion was denied and the defendant appealed. This appeal has not been argued by the defendant and is treated as waived.

The case was heard by a judge of the Superior Court upon the exceptions to the master's report, and before he had entered any order thereon the plaintiff filed a motion to amend the bill. The motion was allowed on June 2, 1926, as of May 22, 1917, the date of the filing of the bill, subject to the defendant's exception. The judge stated that he allowed the motion "in order that the pleadings might conform to the proofs." He denied the defendant's requests that the report be recommitted and that certain portions of the evidence be reported. The references in his order to the "auditor's" report, we assume are to the report of the

master. He overruled the plaintiff's exceptions. The defendant's exceptions to the admission of certain testimony as set forth in the report were overruled on the ground that the evidence was competent or was not prejudicial to the defendant. An examination of such testimony plainly shows that it was rightly admitted. The defendant also excepted to certain findings of the master and to his refusal to make other findings.

An interlocutory decree was entered overruling all the exceptions to the report and confirming the same; and on August 16, 1926, a final decree was entered in which it was adjudged that the defendant owed the plaintiff $4,480.68 as found by the master, with interest thereon from January 1, 1918, to the date of the decree, amounting altogether to $6,799.41 and that the same be paid to the plaintiff together with the taxable costs. Both the plaintiff and defendant appealed from the interlocutory and final decrees.

The amendment to the bill added a paragraph in which in substance it was alleged that "the defendant contracted and agreed with the plaintiff that it would have the said wires carried under ground during their entire course within the said park and that said pole would be removed in the spring; that later in constructing the westerly wall of the building . . . the plaintiff found that the sill would have to be run directly through the said pole; that the matter was called to the defendant's attention and after a conference the plaintiff agreed for the present to make a jog in the building around the pole, the defendant again agreeing that it would be moved in the spring; that by virtue of the words and conduct of the parties a collateral contract was raised . . . wherein the defendant agreed and it became its duty to remove the pole the coming spring."

The judge states in his order that "in passing upon this motion I took occasion to ascertain that testimony in considerable detail with respect to the alleged collateral contract . . . was given at the hearing before the auditor [master] by witnesses on behalf of both of the parties hereto and that no objection was made or exception taken by the defendant to the admission of such testimony." It does not appear

that the judge went outside the record to ascertain whether the amendment proposed presented an issue which had been fully and fairly tried before the master. He expressly states that he was satisfied the matters embraced in the amendment had been fully heard by the master and allowed the amendment in order that the pleadings might conform to the proofs. There was no error in this respect. Whether the amendment was to "enable the plaintiff to sustain the action for the cause for which it was intended to be brought" was a question of fact for the presiding judge. *King* v. *Howes*, 181 Mass. 445, 446. *Strout* v. *United Shoe Machinery Co.* 215 Mass. 116, 119.

It is the contention of the defendant that the issue raised by the amendment was not properly before the master; that it presented a new issue, not alleged in the bill, respecting which the defendant was entitled to introduce evidence. But the report of the master shows, and he found, that "The principal controversy seems to center about the responsibility for an electric light pole carrying high tension wires which was situated so near the building that the public authorities would not allow the building to be opened as a place of public amusement." He states in substance that the plaintiff maintained that it was the duty of the defendant to move the pole, and the defendant contended that the plaintiff was familiar with the situation and should have constructed its building so as to avoid the proximity of the pole; that "The above is the principal contention. . . . the real difficulty is that in the spring of 1917 an electric light pole carrying high tension wires was situated so near this building that the building could not be used as long as both remained in their then existing positions."

The report deals at length with the respective contentions of the parties concerning this pole and the promise of the defendant to remove it in the spring. So far as appears all evidence pertaining to this matter was offered without objection. It is now too late to object to its admission. *Blanchard* v. *Cooke*, 147 Mass. 215. The subject of the amendment was also referred to in the correspondence between the parties; and therefrom, and from the recitals

in the report, the finding was warranted that the position of the pole was the principal subject of controversy between the parties.

The court has power to allow amendments at any time before final judgment. R. L. c. 173, § 48, now G. L. c. 231, § 51. "Many cases have arisen where an amendment to a declaration has been allowed after verdict in order to make the statement of the cause of action conform to the evidence and thus to avoid a variance between the allegations and the proof without any new trial." *Pizer* v. *Hunt*, 253 Mass. 321, 331. The statute permitting amendments applies as well to suits in equity as to actions at law. *Day* v. *Mills*, 213 Mass. 585, 587. *Strout* v. *United Shoe Machinery Co., supra.* See now G. L. c. 231, §§ 51, 144.

Of course the defendant was entitled to have the issue raised by the amendment fully and fairly tried, but it is manifest from the master's report that there has been such a trial. The defendant had its day in court as to the matters alleged in the amendment. Its legal rights were not violated by its allowance. *Bannon* v. *Angier*, 2 Allen, 128. *Pizer* v. *Hunt*, 250 Mass. 498; *S. C.* 253 Mass. 321, 331, 332, and cases there collected.

The agreement, alleged in the amendment, that the plaintiff was to build around the pole and the defendant promised to remove it in the spring was upon a valid consideration. *Sermuks* v. *Automatic Aluminum Heel Co.* 256 Mass. 478, 486. The finding of the master was warranted that "the conduct and conversation of the parties in locating this building are of importance and form a collateral understanding subsequent to the signing of the contract by which both parties are bound. . . . Whatever situation may have arisen then previous to this time, it seems to me that the words and conduct of the parties at that time at any rate raised a new and subsequent contract. . . . Irrespective, therefore, of what the situations of the parties are under the agreement, I find that this was a valid contract between the parties, and that it was the duty of the defendant to remove the pole long before the time of the beginning of the present proceedings, and that the defendant was in default at the

time this action was brought for not having done so." In substance and effect it was found that in addition to the original contract the parties subsequently entered into an independent collateral agreement by which the defendant agreed to remove the pole in the spring of 1917.

It was competent to modify or change the written agreement by a subsequent oral agreement. *Thomas* v. *Barnes*, 156 Mass. 581. *King* v. *Faist*, 161 Mass. 449, 456. *Freedman* v. *Gordon*, 220 Mass. 324, 326. *Gouzoulas* v. *F. W. Stock & Sons*, 223 Mass. 537, 539. *See* v. *Downey*, 256 Mass. 47. *Sermuks* v. *Automatic Aluminum Heel Co.*, *supra*, pages 484, 486. The agreement between the parties is not to be construed as a lease, but as a contract, by the terms of which the parties entered into definite stipulations and they are thereby respectively bound. The rule that there is no implied warranty of the condition of premises leased or that they are suitable for the use for which they were hired, has no application to the contract in question, nor is the doctrine of *caveat emptor* pertinent.

Respecting damages the trial judge ruled upon the findings of the master that the plaintiff was entitled to recover the cost of the building, and that the services of the plaintiff's president in supervising its construction, and the use by him of his automobile, were a part of such cost. The plaintiff was also allowed for freight charges incurred by it in shipping materials to be installed in the building. All of the foregoing items were properly allowed. The judge also ruled, upon the findings of the master, that the plaintiff was entitled to recover for the loss of prospective profits for the year 1917 in the sum of $2,000. The claim for loss of profits for the years 1918, 1919, 1920 and 1921, the master found had not been proved.

The plaintiff's exceptions to the report are solely to the findings relating to damages. The claims for storage of its property in Springfield, for hotel bills in connection with the erection of the building, and for expenses incurred in travelling from Sandusky, Ohio, to Springfield, were rightly disallowed for the reasons stated by the master.

The master found that the plaintiff was entitled to recover

prospective profits for the year 1917. It is not contended that an entertainment such as the plaintiff proposed had ever been given in the vicinity of Springfield or in any other place in this Commonwealth. Although we must take the findings of the master that such profits can be recovered, it is plain that he based his findings wholly on evidence respecting shows, similar to the one intended by the plaintiff, conducted at so called amusement parks in Providence, Rhode Island, and Sandusky, Ohio. Profits of this kind do not arise from the use of any necessity of life or established business, but from a novelty in the show business. All the cases relied on by the plaintiff are distinguishable in their facts from the case at bar. In *Weston* v. *Boston & Maine Railroad*, 190 Mass. 298, scenery for use in a travelling theatrical show was so delayed that an advertised performance could not be given. The damage allowed was not prospective profits, although of course they formed the basis of the rental value. The damages in *Gagnon* v. *Sperry & Hutchinson Co.* 206 Mass. 547, 556, arose from loss of prospective profits in an established grocery business where profits had been increased by the use of trading stamps; this use was suddenly withdrawn, thereby causing a breach of contract. The profits permitted to be recovered in *Neal* v. *Jefferson*, 212 Mass. 517, relate to a hotel in Florida which the plaintiff had actually conducted for a year, so that there was a basis of actual experience. *Nelson Theatre Co.* v. *Nelson*, 216 Mass. 30, and *Orbach* v. *Paramount Pictures Corp.* 233 Mass. 281, were cases where damages were allowed for loss of prospective profits in connection with performances in theatres, but in each case there had been an actual occupation of the premises for that business, thus affording a basis of computation founded on past experience. *Boston Box Co. Inc.* v. *Shapiro*, 249 Mass. 373, involved a loss of profits arising from the breach of an ordinary commercial contract, and is distinguishable in its facts from the present case.

It is well settled that prospective profits may be recovered for breach of a contract where their loss "is the proximate result of the breach, and is such as in the common course of

events reasonably might have been expected, at the time the contract was made, to ensue from a breach, and where it can be determined as a practical matter with a fair degree of certainty what the profits would have been." *John Hetherington & Sons, Ltd.* v. *William Firth Co.* 210 Mass. 8, 21. It was said in *Lowrie* v. *Castle*, 225 Mass. 37, at pages 51 and 52, that "Prospective profits may be recovered in an appropriate action when the loss of them appears to have been the direct result of the wrong complained of and when they are capable of proof to a reasonable degree of certainty. They need not be susceptible of calculation with mathematical exactness, provided there is a sufficient foundation for a rational conclusion. . . . But such damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty. The nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts."

Tested by the foregoing statement of the law, we are of opinion that the profits claimed in the case at bar are too conjectural and uncertain to be recovered. Whether any profits would have resulted from the entertainments during the season of 1917 or in the four succeeding years was not proved with a reasonable degree of certainty. The case is governed in principle by the cases last above referred to and by *Curtis* v. *Boston Ice Co.* 237 Mass. 343, 350, *Lalime & Partridge, Inc.* v. *Hobbs*, 255 Mass. 189, 193, *Busy Bee Confectionery Co.* v. *Broadway National Bank*, 258 Mass. 360, 363.

The testimony of the plaintiff's president as to the attendance at similar shows, the items of expense connected therewith, and the net profits derived therefrom, was competent, and the exceptions to its admission must be overruled. The five letters written by the defendant's president were admissible to show his agency and the circumstances surrounding the making of the contract; they were admitted for no other purpose. The master states that they did not materially affect his findings.

The contract provided that the building to be erected by the plaintiff should be "in harmony with other buildings now

located at the park and satisfactory" to the defendant. The master found in substance that the building erected was in harmony with the other buildings, and that it should have been satisfactory to the defendant acting reasonably. *Handy* v. *Bliss*, 204 Mass. 513, 519, 520. The evidence relating to these findings is reported. The authority of the master is governed by the terms of the rule. He should not have reported the evidence or parts of it, without direction to do so. *Jameson* v. *Hayes*, 250 Mass. 302, 306, 307. These findings cannot be said to be unwarranted and the exceptions to them must be overruled.

Eighty-eight exceptions taken by the defendant were to the refusal of the master to make certain findings and to certain findings made by him. The fifty-seventh and fifty-eighth exceptions, in view of the findings, so far as they relate to prospective profits during the year 1917, must be sustained. In the absence of the evidence, it is plain that the others must be overruled. The eighty-ninth exception was to the refusal of the master to make certain rulings of law and to certain inferences drawn by him. His only duty under the rule was to find the facts; he was not required to make rulings of law. *New England Foundation Co.* v. *Reed,* 209 Mass. 556, 562. *Bradley* v. *Borden,* 223 Mass. 575, 586. This exception must be overruled. We cannot say that the inferences drawn by the master and excepted to by the defendant were unwarranted, in the absence of the evidence.

The denials of the defendant's motion to recommit the report and its request that certain portions of the testimony be reported were not erroneous.

The plaintiff's exceptions to the master's report are overruled.

It follows that the defendant's fifty-seventh and fifty-eighth exceptions to the finding of the master, so far as they relate to prospective profits for the year 1917, must be sustained. The final decree is to be modified by omitting therefrom the sum of $2,000 allowed for loss of prospective profits during the year 1917, together with interest thereon, and as so modified it is affirmed, with costs.

*Ordered accordingly.*