In re PHOENIX RESTORATION SPECIALISTS, INC. Debtor.

George ROSENBERG, Trustee in Bankruptcy of Phoenix Restoration Specialists, Inc., Plaintiff,

v.

Edward LATIF, d/b/a Oakwood Farms, Defendant.

Bankruptcy No. 80–0335–HL.
Adv. No. 80–435.

United States Bankruptcy Court, D. Massachusetts.

Sept. 15, 1981.

Norman A. Erlich, Silverman & Kudisch, Boston, Mass., for plaintiff.

Brian A. O'Connell, Boston, Mass., for defendant.

## MEMORANDUM AND FINDINGS ON DAMAGES

HAROLD LAVIEN, Bankruptcy Judge.

Phoenix Restoration Specialists, Inc., hereinafter called Phoenix, contracted to construct three retail food stores in malls in Peabody, Holyoke and Framingham. The work started in Peabody on August 6, 1979 and was substantially completed on October 3, 1979. In Holyoke, the contract was signed on August 24, 1979, work started September 4, 1979 and was completed November 14, 1979. The Framingham contract was signed October 19, 1979 and Phoenix performed one or two days' work, starting October 19, 1979, before abandoning the project. This somewhat protracted litigation commenced on July 14, 1980, when the Trustee filed a complaint seeking payment for extras. The Defendant, Edward Latif, hereinafter called Latif, answered and filed a counterclaim for work not performed, work improperly performed, the failure to construct Framingham, and liquidated damages for delay. Originally, answer and counterclaim were filed by counsel, then Latif insisted on appearing pro se but, after urging by the Court, he retained counsel prior to the liability trial. At the request of counsel, the trial was bifurcated with the liability trial commencing on November 19, 1980 and utilizing the better part of five nonconsecutive days, concluding on January 5, 1981 with findings announced from the bench.

Prior to the liability trial, both Latif and the Trustee filed requests for production of

documents covering plans, bills, receipts, etc., and the Trustee also filed interrogatories seeking a detailing of Latif's counterclaim. Latif, then acting pro se, failed initially to produce or answer interrogatories. After an Order by the Court and an explanation to Latif of his obligation, the interrogatories were answered and some plans were produced. The Trustee sought to default Latif for failure to produce and Latif, when pushed during the pre-trial, October 10, 1980, for the bills for the so-called corrective work, told the Court that he had not done any of the work yet, he had not spent any money yet and, therefore, he had no bills. On that basis, the default was not granted.

During the liability trial, all of the plans introduced were provided by Latif. Phoenix's president testified he could not find any of the plans, bills or most records.

A pre-trial hearing was held on March 19, 1981, prior to the damage trial. Parties were to exchange bills, plans, and documents, but very little was exchanged. The trial began on May 12, 1981 and ended August 31, 1981 after seven non-consecutive days of trial.

During the trial on damages, there were three unexpected developments. First, the electrical sub-contractor testified that the electrical plans for Peabody and Holyoke that had been introduced by Latif in the liability trial were not plans on which he bid, although they looked similar and had the same date and signature. Second, the electrical engineer who drew the plans for Latif testified that the plans offered in liability trial were the finished set and the set used by the electrical contractor was a preliminary set but that it was not his practice to indicate by date or words the progression of the plans so that there was no way of telling the earlier from the later plan. Third, Rasczkowski, the Debtor's President who had sat with Trustee's counsel throughout the trial, now, in mid-June, discovered some additional plans, some bills, and some records. All of this so-called newly discovered evidence was found in a garage, a location previously searched. Un-

fortunately, this find still did not include the very important bid and estimate computation sheets.

The Trustee filed a motion for new trial, based on the so-called newly discovered evidence because of both the importance of this matter and its effect on Latif's credibility. The new trial was denied but the Trustee was given the opportunity to specify those areas where additional evidence might be warranted because of confusion as to what might be considered an extra under the new plans and where the new material might justify review by the Court of its findings that were based on Latif's credibility. The Plaintiff, in his submission, was to include any bills or charges now in his possession covering any claimed extras and a copy of bid computations. Latif was given an opportunity to reply and, in light of the new plans, to specify those items in his counterclaim still claimed, making reference to the particular plan on which his claim was based.

Both parties made their submissions, the Trustee not including the bid computations or copies of the bills and Latif detailing his claims but failing to include bills or to tie his claims to particular plans.

The Court reviewed the Trustee's contentions and advised the parties in writing seven days before the resumption of trial as to which items it would receive evidence, would hear argument, or would foreclose as merely an attempt by the Trustee to re-try his case.

As to the electrical sub-contractor, I not only found his testimony credible, but that two plans bearing the same date, signature and legend, with no indication of a revision, could only intentionally, or otherwise, mislead Phoenix and the electrical sub-contractor. I find the electrical sub-contractor had only the original set from which he prepared his bid and worked. Even if Phoenix had both sets, a matter I am not prepared to find, there was no reason for Rasczkowski, who was not an electrician, to be aware that he was not dealing with merely additional copies. I am willing to accept that Latif was unaware of what

occurred but, deliberate or otherwise, this unacceptable failure to distinguish the revised plan can only mislead and the owner, Latif, must bear the responsibility. I, therefore, accept as extras, the work performed by the electrician in Peabody and Holyoke that exceeded the first electrical plan.

However, as to the other preliminary sketches on Holyoke, they are in reality a red herring. I have no doubt that Rasczkowski, in his eagerness for the job, started his bid computation from early sketches but the contract for Holyoke was not signed until August 24, 1979. By then, the August 1st blueprint had been received. Not only did Latif testify that Rasczkowski went with him to the architect's office to pick it up, but when it was offered at the very beginning of the liability trial, Trustee's counsel in a colloquy with the Court, admitted it was the bid plan. So all the other plans were clearly preliminary and though it would have been forthright of Latif to have detailed the progression of the plans, they are of little practical significance except as it might affect my evaluation of Latif's testimony. Of course, Phoenix would be entitled to extras for the difference between the August 1 plan and the September 15 plan, a date subsequent to the agreement.

## I. PLAINTIFF'S RECOVERY FOR EXTRA WORK PERFORMED

█ Based on the evidence on damages presented over five days of trial, I make the following findings as to the amount owing the Plaintiff by the Defendant for work found to be authorized "extras". As a preliminary matter, note that findings as to the labor costs are expressed in man-hours. Each man-hour is valued at $9.00 for regular employees and $15.00 for supervisors (i.e. Thompson and Rasczkowski) which includes employer contribution for taxes, insurance and pensions. To these figures are added the "10% and 10%" for overhead and profit making the hourly rates $10.89 and $18.15, respectively. The "10% and 10%" is also added to the cost of materials. Ten percent for profit is added to the dollar amount of work done by sub-contractors.

### PEABODY

1) *Wrap-room door*—$125.00, the amount stipulated to by the parties.
2) *Unloading barrels*—$89.12. I find that approximately 44 barrels, weighing approximately 25 lbs. each, were moved 40'–45' four times by the Plaintiff and allow 8 man-hours labor.
3) *Storage top for wrap-room*—$275.00, the amount stipulated to by the parties.
4) *Door to the back office*—$35.09. I find the cost of materials to be $20.00 for hinges. Since the door itself was cut in a sheet of cedar paneling that would have been required in any event, it was not an additional expenditure. I find the labor time to be one hour.
5) *Stud wall with cedar running from column to side of store*—$459.07. I find the cost of materials to be $157.40. This covers two sheets of drywall and sixteen 12 ft. and 41 l.f. of cedar. Thompson testified to additional materials used but no evidence of their cost was presented. I find the total labor time to be 24 man-hours which includes one hour of supervisory time.
6) *Change in back wall*—$0. Thompson testified that the new back wall took seven man-hours, plus one hour in supervisory (i.e. planning) time, above the time that would have been required if the wall had been built as set out in the plans. There was no evidence as to the additional materials required, though there was testimony that the new wall eliminated some ceiling materials and carpeting.

Harvey testified that it would take *less* time to build a free-standing wall than to build a stud wall, but more material, and that the total labor and materials required for the wall *as built* would be $443.00 less than the cost if the plan had been followed.

The figures presented by each side seem to be substantially off-setting, and therefore I consider the item a wash.

7) *Plumbing for refrigeration units* —$981.64. Some of the items dealing with refrigeration were not Phoenix's original responsibility but when not performed by others, the Court found during the liability trial that it was necessary that the work be performed and Latif authorized Phoenix to do what was necessary in this regard so that work could go forward. I find the cost of installing a drain not disclosed on the plans and for installing condensate piping, work done by the plumbing sub-contractor, Cheever Bros., was $775. I find the cost of drilling four additional holes through the concrete floor for refrigeration was $117.40. This figure includes the drilling subcontractor's charge for travel time and mileage.

8) *Relocation of refrigeration cases* —$188.76. I find that four man-hours were required for making a depression in the floor to accommodate the refrigeration cases, moving cases, reconstructing the floor, and fastening the cases into place. In addition, I find that Rasczkowski was required to spend one day (8 man-hours at the supervisory rate) securing the necessary modifications and approvals for the refrigeration plans, including one trip to the architect's office in Boston.

9) *Shipping charges* —$320.86, paid by Phoenix on items ordered by Latif and shipped to the store.

10) *Cabinet work in gift wrap area* —$85.00, as stipulated by the parties.

11) *Unloading refrigeration units* —$0. I find, based on the November 9, 1979 letter to the Plaintiff corporation from Cable-Wiedemer, Inc., the refrigeration sub-contractor, and the testimony of Rasczkowski, that the Plaintiff was paid at least $286.22, and perhaps another $286.22, by Cable-Wiedemer to cover the cost of unloading the refrigeration equipment, trucking and plywood.

12) *Roofer* —$1,320.00. The Plaintiff was billed $1,200.00 by the roofing sub-contractor, New England Waterproofing Corp., for roof work, such as a roof cut for refrigeration lines, associated with the placement of a condenser unit on the roof.

13) *Bolting sidewalls* —$690.36. The evidence on this item could have been more helpful. Rasczkowski testified to significant labor costs (240 man-hours) and to the tremendous number of toggle bolts used, but provided no evidence on the *difference* in cost between bolting the sidewalls and building them as per the plans.

I find that the bolting method exceeded the nailing method both in labor and materials. However, I do not accept Rasczkowski's testimony that 10 toggle bolts are needed for each 12' stud. Common sense says this figure is excessive and a photograph taken of a sidewall at Peabody suggests occasional bolts were used to reinforce nails. I accept Harvey's testimony that approximately 45 toggle bolts would be needed to attach studs over a 76' distance (the length of the sidewalls in the Peabody store) although even that may be high considering that toggle bolts are certainly superior to nails and, yet, the plans only called for six nails over a 12' stud. I do accept Rasczkowski's testimony that there are seven rows of studs on each sidewall and the bill indicating toggle bolts were about $.35 each at the time of construction in 1979. Forty-five toggle bolts × 7 rows × 2 sidewalks equal 630 toggle bolts at $.35 each equal $220.05. To this figure, I also add $17.50 for washers.

As for labor time, I accept the figure of 3.5 minutes per toggle bolt which comes to a total of 37 man-hours.

14) *Electrical* —$1,250.31. This finding includes $262.25 for thermostat re-wiring, $320.00 for wiring an additional water heater in the basement and additional outlets in the walls in the basement, and $528.00 for 16 lam light bulbs (400 watt metal are lamps), all items not included in the undated electrical plan on which the electrical sub-contractor, Sandler Electric, placed its bid.

TOTAL TO PLAINTIFF ON PEA-
BODY = $5,820.21

## HOLYOKE

1) *Change in mezzanine plumbing layout* —$0. There was no evidence presented on damages.

2) *CVS supervision* —$220.00. The Plaintiff was billed $200.00 on October 21, 1979 for 25 man-hours labor at $8.00/hr. performed by CVS Company personnel.

3) *Change in stair plan* —$72.60. I accept Thompson's testimony that four hours of supervisory time were required.

4) *Change at top of stairs in order to make more room in wrap room* —$87.12. I accept Thompson's testimony that six man-hours were required, three of these hours representing supervisory time. Though Thompson stated that approximately nine square feet of cabinet space was created by the revision, there was no evidence as to the cost of additional materials.

5) *Fireproofing* —$0. I modify my finding on liability and find that the August 1, 1979 plan requires that two layers of ⅝″ fire code gypsum board be installed on the entire right-hand wall by the tenant. Rasczkowski admitted same on cross-examination but explained that he had given the sub-contractor the *sketch* plan of Holyoke, a plan that did not detail this fireproofing requirement and preceded the August 1 plan. Even accepting this explanation, it is irrelevant because I have found that Rasczkowski had the August 1 plan in his possession before he submitted his bid on August 24 and, therefore, was responsible for including in that bid all items shown on the August 1 plan.

6) *Added display on left-hand wall of store* —$65.40. I accept Thompson's testimony that the work required six man-hours labor. No evidence was presented as to any additional materials cost.

7) *Boxing beam that supports floor of mezzanine* —$217.80. I accept Thomp-

son's testimony that 20 man-hours labor was required. Again, there was no evidence as to the materials used or their cost.

8) *Increased cost of pipe* —$522.31. I find the difference in cost between the Orangeburg pipe described in the plans and the metal pipe actually required to be installed was $259.81. This represents a cost difference of $4.88 per linear foot for 44 linear feet of pipe. In addition, the Plaintiff is entitled to $288.75 based on his cost of $262.50 for hiring an aerial lift to get the heavier metal pipe into the store.

9) *Bolting sidewalls* —$0. The photograph taken by Latif of a sidewall at the Holyoke store shows studs attached with nails. Rasczkowski testified that he believed the photograph to represent the Holyoke store and that although he had directed his personnel to attach the studs with toggle bolts, he had no personal knowledge that they had in fact done so. Given this strong evidence that the bolting method was not used in the Holyoke store, I modify my finding on liability and exclude this item as an extra. I note that if, in fact, there are occasional toggle bolts, the Plaintiff is amply compensated under the Peabody "bolting" item since I have provided for payment there of toggle bolts on *seven* rows of studs and it is unlikely that the top and bottom rows are toggle-bolted since they carry no shelving weight. Also, Harvey's estimate of 45 toggle bolts per 76 l.f. would probably be considerably less if he knew that nails were also being used.

10) *Construction of door in mezzanine* —$125.00, the amount stipulated to by the parties.

11) *Roofer* —$880.00. The Plaintiff was billed $800.00 by the roofing sub-contractor, Titan Roofing, for roof work associated with the placement of a condenser unit on the roof.

12) *Moving barrels* —$65.34. I find that approximately 44 barrels, presumably

the same type of 25-lb barrel located at the Peabody store, were moved four times by the Plaintiff and allow six man-hours labor.

13) *Shipping charges*—$280.29, the amount stipulated to by the parties.

14) *Electrical*—$334.90. This amount covers the labor and materials billed the Plaintiff by the electrical sub-contractor for work he was required to do that was not shown on the first electrical plan.

15) *Steel*—$0. Plaintiff submitted a bill from a sub-contractor, Elwell Ironworks, for $3,179.99 for the steel beam supporting the mezzanine and for steel over the front door and argued that these items should be included as extras because they were not shown on the "newly discovered" *sketch* plan for the Holyoke store. Since I have found the August 1 plan to be the controlling document and these items are on the August 1 plan, the Plaintiff is not entitled to additional payment.

TOTAL TO PLAINTIFF ON HOLYOKE = $2,870.76

## II.  LATIF'S CREDITS:

A. *Cost of completion*

1) *Rebuilding of store front and doors*—$0. I accept the testimony of Bettencourt, the contractor hired by Latif to ultimately build the Framingham store after he worked on the Peabody doors, who personally inspected the Peabody and Holyoke stores, and find that the doors were constructed properly. The problem was caused by their design.

2) *Raising counters six inches in height and installing formica doors*—$0. The plans did not specify a height. There was no evidence a height was orally specified by Latif and I find the 3' 3" to which the counters were built was within the height acceptable in the industry. The only evidence was a bill the Defendant sought to submit for performance of this work prior to October 10, 1980. The bill was excluded

because the Defendant had failed to produce it in accordance with the Court's Order of September 24, 1980 and had, in open court, on October 10, 1980, stated that he had as yet had no corrective work performed and the Court, in reliance on that representation, did not grant the Trustee's request to default or dismiss the counterclaim.

3) *Installation of vinyl base at counters*—$0. No competent evidence was presented as to the item either as an extra or as to its value.

4) *Installation of three cedar beams*—$751.40. I accept Thompson's testimony that each beam requires 13 man-hours of labor for a total of 39 man-hours and Rasczkowski's testimony that the materials cost totals $270.00 for three beams.

5) *Improve grade of ceiling material*—$0. No competent evidence was presented as to value.

6) *Front door repair work*—$0. The evidence sought to be admitted was of work performed before October 10, 1980 and hence was excluded for Defendant's failure to comply with the Court's Order and, in any event, as in item 1, this was a design not a construction problem.

7) *Installation of two formica service units*—$0. Evidence on this claim was not allowed because there had been insufficient notice to the Plaintiff of the claim. The claim was not encompassed in the pleadings and was not listed either in the Defendant's counterclaim or in his answers to interrogatories specifying damages.

8) *Replacement of nine defective two-light 425 MA ballasts*—$60.00 allowed for the two ballasts that were actually replaced by the Defendant and for which he paid $30.00 each.

9) and 10) *Miscellaneous electrical work*—$0. There was no competent evidence presented.

TOTAL FOR INCOMPLETE OR DEFECTIVE WORK AT PEABODY—$811.40

122

## HOLYOKE

1) *Installation of type B steel exit door* —$225.00. I find that such a door was required by the plans and under paragraph 16 of the contract and allow $225.00, based on the testimony of Rasczkowski that the cost of this type of door installed in 1979 is in the range of $175.00 to $300.00.

2) *Rebuilding of defective store front and doors* —$0. Harvey testified that the cost of rebuilding the doors in 1979 would be $969.47, but I do not allow this cost because I find that the problem with the front doors is their design for which the Plaintiff is not responsible.

3) *Raising height of counters and installing formica doors* —$0. The evidence sought to be admitted was for work performed prior to October 10, 1980 and hence was excluded for Defendant's failure to comply with the Court's Order, as more fully described within (2) under Peabody.

4) *Installation of formica service units and display case* —$500.00. This amount is allowed for work performed after October, 1980 and paid for by the Defendant.

5) *Installation of vinyl base at counters* —$0. No competent evidence was presented.

6) *Installation of three cedar beams* —$751.40. Same findings as (4) under Peabody.

7) *Installation of rubber stair treads* —$96.00. This amount is allowed on the basis of Harvey's testimony. Rasczkowski's testimony concurred.

8) *Building of U-shaped shed roof* —$632.40. This amount is allowed on the basis of Harvey's testimony. It was found at the liability trial that the plans called for the U-shaped roof but that the Plaintiff had constructed a simpler straight-line roof.

9) *Installation of R–11 insulation* —$693.21. This amount is allowed based on Harvey's testimony. The requirement of R–11 insulation is shown on the August 1 plans.

10) *Supplying display case hardware* —$0. The evidence sought to be admitted was of materials purchased before October 10, 1980 and hence was excluded for Defendant's failure to comply with the Court's Order, as more fully described within (2) under Peabody.

11) *Complete painting* —$0. Evidence on this claim was excluded because notice to the Plaintiff of the claim was insufficient.

12) *Repair work on front doors* —$0. Evidence on this claim was excluded because the repair work was performed prior to October 10, 1980 and the Defendant failed to comply with the Court's Order. In any event, I have found the problem to be caused by the design of the doors and thus not the responsibility of the Plaintiff.

13), 15), 18), 19), and 20) —*Miscellaneous electrical work* —$0. No competent evidence was presented.

14) *Installation of two smoke detectors* —$0. No competent evidence was presented.

16) *Installation of one 2′ × 4′ fixture with tubes* —$85.00. This amount is allowed on the basis of the Defendant's testimony since this is a common fixture.

17) *Installation of one exit light* —$0. No competent evidence was presented.

21) *Rebuilding of stairs* —$0. In the liability trial, I found the change in stair plan to be authorized and therefore disregard as irrelevant both Harvey's testimony that the stairs were not built according to either the August 1 or September 15 plans and the corresponding testimony as to damages of $1,995.00.

22) *Installation of two layer gypsum board drywall* —$0. The Plaintiff produced a bill from United Drywall, a drywall sub-contractor, to show that a second layer of drywall was in fact installed, and I so find.

TOTAL FOR INCOMPLETE OR DEFECTIVE WORK AT HOLYOKE = $2,983.01.

B. *Liquidated damages for delay in completion*—Peabody and Holyoke

█ Both the Peabody and Holyoke contracts contained a four week completion deadline. Further, the contracts contained the following provision: "A fine of five hundred dollars ($500.00) ["three hundred dollars ($300.00)" in the Holyoke contract] per week is to be paid the contractor for every week's delay." I found in the liability trial that this was a valid liquidated damage clause and that in Peabody there was one week delay beyond the three weeks found excusable, and in Holyoke, three weeks delay beyond the three weeks found to be excusable. On these findings, Latif is entitled to $500.00 in damages for Peabody and $900.00 for Holyoke.

C. *Framingham*

█ I find that the Plaintiff entered a contract with the Defendant on October 19, 1979 to construct a store in Framingham for $28,000. The Plaintiff worked on the Framingham job only one or two days in October and then abandoned the job. In March of 1980, the Defendant entered into a contract with Independent Installers, Inc. to construct the Framingham store for $43,-000. There was no evidence that the work to be performed by Independent Installers, Inc. went beyond that required of the Plaintiff. An owner "cannot lie idly by and expect to recover all losses which such inaction may detail", *Hall v. Paine*, 224 Mass. 62 at 64, 112 N.E. 153, but here, there was no evidence that the cost of completion would have been any less if the Defendant had secured a replacement contractor more promptly. Therefore, I allow the Defendant $15,000, the reasonable cost of completing the contract ($43,000) less the unpaid part of the contract ($28,000). *DiMare v. Capaldi*, 336 Mass. 497, 146 N.E.2d 517 (1957).

█ The Defendant seeks enforcement of a liquidated damage clause identical to that contained in the Holyoke contract. In the case of Framingham, the clause will not be enforced. Such a stipulation is applicable only to the breach provided for in the clause. 13 Am.Jur.2d § 84, p. 85. This clause provided for liquidated damages in case of *delay* in completion beyond the completion date specified in the contract. A clause addressed to delay is inapplicable to a situation such as this where the Plaintiff, after insignificant preparatory work, failed to perform.

Where a contract expressly provides stipulated or liquidated damages for failure to complete a building within a specified time, and the breach alleged is a refusal to perform any part of the contract, and it appears that the parties, in stipulating for liquidated damages, did not contemplate such refusal, but only failure to complete within the specified time, the damages sustained by the alleged breach of the contract should be determined not by the stipulation contained in the contract, but by proper rules of law. 13 Am.Jur.2d § 87, p. 88.

Even if liquidated damages in Massachusetts might be appropriate, Latif has failed to carry the burden of proof as to the necessary dates. The Defendant took five months to enter into an agreement with a replacement contractor. This is an unreasonably long period of time, especially during the winter months when construction work is slow. The replacement contractor needed four months to perform the contract. It may be that the Defendant's busy schedule during the holiday season prevented him from actively pursuing the Framingham project. However, the Plaintiff should not bear the cost of a delay that was substantially due to the Defendant's inactivity. A party injured by a breach of contract must take reasonable steps to put himself in as good a position as he would have enjoyed had the contract been fulfilled. *Hall v. Paine*, 224 Mass. 62 at 65, 112 N.E. 153 (1916).

█ Neither will the Defendant be allowed to recover for lost profits occasioned by the delay in opening the Framingham store. This was a new business in a new location and in Massachusetts, prospective profits are not recoverable in cases involving untried businesses because the projected

lost profits are considered too speculative. *Narragansett Amusement Company v. Riverside Park Amusement Company*, 260 Mass. 265, 157 N.E. 532 (1927); *Robie v. Ofgant*, 306 F.2d 656 (1st Cir. 1962). The fact that the Defendant had similar stores in other locations does not help the Defendant. In *Narragansett* the Court rejected as evidence of lost profits the profit figures from other amusement parks that the complainant operated.

III.                    SUMMARY

Damages awarded Plaintiff

| | | |
|---|---|---|
| For extra work — Peabody store | $ 5,820.21 | |
| For extra work — Holyoke store | 2,870.76 | |
| | $ 8,690.97 | |

Damages awarded Defendant

| | | |
|---|---|---|
| Peabody: | Cost of completion | $   811.40 |
| | Liquidated damages for delay | 500.00 |
| Holyoke: | Cost of completion | 2,983.01 |
| | Liquidated damages for delay | 900.00 |
| Framingham: | Cost of completion | 15,000.00 |
| | | $20,194.41 |

Judgment to issue for Edward Latif, d/b/a Oakwood Farms, in the amount of $11,503.44.