## In re MARTIN SPECIALTY VEHICLES, INC., and M.S.V., Inc., Debtors.

## M.S.V., INC., Martin Specialty Vehicles, Inc., Carole Martin, Plaintiffs,

v.

## BANK OF BOSTON—WESTERN MASSACHUSETTS, N.A., Defendants.

Bankruptcy Nos. 86–40095, 86–40096. Adv. No. 86–4012.

United States Bankruptcy Court, D. Massachusetts.

June 16, 1988.

---

David Nickless, Nickless & Phillips, Fitchburg, Mass., for, M.S.V., Inc./debtor plaintiff, Martin Specialty Vehicles, Inc. plaintiff, Carol Martin/plaintiff, Thomas Strahs/plaintiff.

Maurice Cahillane, Egan, Flanagan & Egan., Springfield, Mass., for Bank of Boston–Western Mass. defendant.

## OPINION

JAMES F. QUEENAN, Jr.,
Bankruptcy Judge.

This is a complaint by a corporation and its principal stockholder alleging a wrong-

ful foreclosure by the corporation's lender, Bank of Boston—Western Massachusetts, N.A. (the "Bank"), which caused the termination of its business. The case was tried under three theories outlined in the plaintiffs' opening: that the corporation's loans were not in default; that the Bank had no security interest in the assets; and that the Bank acted in bad faith. The Court holds that the Bank had an enforceable security interest, but awards damages for wrongful foreclosure because there was no default when the Bank foreclosed and because it acted in bad faith. Presented is a shocking case of a bank destroying a young business for reasons having nothing to do with the merits of the lending relationship.

## I. THE PLEADINGS, PRIOR MOTION FOR MANDATORY ABSTENTION, AND PRIOR MOTION FOR REMOVAL OF PENDING STATE COURT ACTION

The plaintiffs are M.S.V., Inc. ("MSV"), its predecessor, Martin Specialty Vehicles, Inc. ("Specialty"),[1] and their stockholder, Carole Martin ("Martin"). The complaint as amended was originally joined in by a third plaintiff, Thomas Strahs ("Strahs"), and contained eight counts: Count I seeking a turnover of the property seized and damages; Count II for conversion; Count III for trespass to chattels; Count IV for trespass to real estate; Count V for interference with advantageous business relations; Count VI for violation of Mass. Gen.L. ch. 93A pertaining to unfair or deceptive acts or practices; Count VII requesting a declaration that the Bank held no valid security interest; and Count VIII claiming damages by reason of estoppel. Both corporate plaintiffs have filed petitions with this Court seeking relief under Chapter 11 (11 U.S.C. § 1101 *et seq.*). Martin has filed a petition requesting an arrangement under Chapter 13 (11 U.S.C. § 1301 *et seq.*).

MSV brought suit in state court prior to filing its Chapter 11 petition here. After

---

**1.** Although Specialty's proper name, based upon its records of organization on file in New Hampshire, is "Martin Specialty Vehicles (MSV) Inc.," we ignore the discrepancy as inconsequential for our purposes.

the filing of the Chapter 11 petitions, the plaintiffs commenced this adversary proceeding and moved that the state court proceeding be transferred here and consolidated with this proceeding. The Bank responded by filing a motion for mandatory abstention under 28 U.S.C. § 1334(c)(2).[2] The Court denied the motion to transfer and consolidate. The Court granted the Bank's motion for abstention except with respect to Count I (turnover and damages), Count VII (validity of security interest), and Count VIII (damages by reason of estoppel). The Court dismissed Strahs, who was not a debtor in any proceeding before the Court, as a plaintiff on all counts. No appeal was taken by any party. In its decision, the Court referred to the estoppel count as including a cause of action for equitable subordination. The plaintiff accordingly asserts a cause of action for equitable subordination. The Bank has made no contention that this cause of action is not open under the pleadings, nor has it objected to the case being tried under the theories outlined in the plaintiff's opening. Because of this, and because of the general nature of the allegations contained in the remaining counts, we now adjudicate causes of action for equitable subordination and for damages under all three of those theories. We here set forth our findings of fact and rulings of law.

## II. PRINCIPAL FINDINGS OF FACT

MSV is a Massachusetts corporation which was engaged in the business of manufacturing and selling specialty vehicles. Its products included vehicles such as bus chassis converted into mobile hospital units. It also manufactured and sold converted vans, and it sold at retail vehicle accessories. MSV began its corporate existence on January 4, 1985, with 52% of its

stock owned by Martin, 24% owned by Strahs and 24% owned by Felix Tranghese ("Tranghese"). MSV is the successor to Specialty, a New Hampshire corporation engaged in the same business. Specialty ceased operations after the organization of MSV and lost its charter as of November 3, 1986 for not filing annual reports. In March of 1985, it filed with the New Hampshire authorities a notice of its intention to dissolve. At all material times, Martin has served as MSV's president and treasurer and Strahs has been its clerk. The two constitute MSV's board of directors. They also held the same offices with Specialty at all material times. Tranghese has never held an office with either MSV or Specialty, nor has he taken any role in either corporation's daily operations. Martin's principal responsibilities with both corporations were in the financial area; Strahs' responsibilities were in sales.

The predecessor corporation, Specialty, commenced operations in 1981, the year of its incorporation. It was incorporated in New Hampshire because Strahs lived there with his wife and children. Martin and Strahs met a few years before while they were both employed by Van American Company, a corporation engaged in van conversions. Specialty from the beginning has had a borrowing relationship with the Bank in a variety of loan transactions. Its principal borrowings, and later those of MSV, were related to the floor planning of inventory. Martin and Strahs personally guaranteed all loans.

In 1984, Specialty decided to move from its leased quarters in Chicopee, Massachusetts. It expressed interest in purchasing a building on Parker Street, Springfield, Massachusetts, but the Bank declined to finance the purchase because Thomas Lucas ("Lucas"), the Bank's loan officer then

---

**2.** 28 U.S.C. § 1334(c)(2) provides:

Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an ac-

tion is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction. Any decision to abstain made under this subsection is not reviewable by appeal or otherwise. This subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

primarily responsible for MSV's account, did not approve of the site. Shortly thereafter, an acquaintance whom Martin met by chance in a restaurant introduced her to Tranghese. She told Tranghese of her problems in getting the Bank's approval for a new building. Tranghese said that he had contacts with the Bank and offered his help. At that time, or shortly thereafter, Martin and Strahs were interested in a building at 867 Boston Road in Springfield. Tranghese accompanied them on a visit to the Bank and introduced them to several of the Bank's officers, including its president. The Bank thereafter financed the purchase for the full purchase price, $160,000. Specialty guaranteed the loan. The purchase took place on November 21, 1984, with title taken in the names of Martin, Strahs, and Tranghese as tenants in common. Martin and Strahs allowed Tranghese to participate in the real estate purchase, and later in the ownership of MSV, because he helped with the real estate financing and in getting Specialty qualified for grants from the Springfield Small Business Development Fund. They were impressed with Tranghese's apparent influence with both institutions. Tranghese paid nothing for either of these interests.

Tranghese had the reputation of being a member of organized crime in the Springfield area. Martin and Strahs knew of this reputation when they first met him, as did the Bank. Tranghese is presently serving a prison sentence for various crimes, the specifics of which were not placed in evidence.

In late 1984, both the Bank and the Springfield Small Business Development Fund suggested to Martin and Strahs that they incorporate the business in Massachusetts. As a result, on December 3, 1984 Martin and Strahs signed MSV's Articles of Organization for the purpose of incorporating MSV as a Massachusetts corporation. MSV began its corporate existence on January 4, 1985 when the Secretary of State approved the Articles of Organization. Stock was issued to Martin, Strahs, and Tranghese in the percentages previously set forth. After some further delay caused by the necessity to obtain a federal tax identification number, MSV opened a checking account with the Bank on March 4, 1985. On that day Lucas visited MSV's plant. He brought with him the Bank's form of corporate resolutions for the opening of a new account in the name of MSV, which Martin and Strahs signed. The Bank never did change the name of the borrower on any of its records concerning loans. After the organization of MSV, Martin and Strahs signed some loan documents in the name of MSV and some in the name of Specialty.

Effective January 4, 1985, MSV acquired the assets and assumed the liabilities and operations of Specialty. No bill of sale or other document of transfer was ever signed, nor did the directors of either MSV or Specialty adopt any resolution to authorize the transfer and assumption. But the conduct of the parties unambiguously accomplished the same result. On October 22, 1984, Specialty sent a letter to all of its suppliers, with a copy to Lucas, informing the suppliers of its intended move to 867 Boston Road, and stating in part:

> Since you have been with us since the beginning and have known that Martin Specialty Vehicles is a company that was incorporated in the State of New Hampshire. The Bank of Boston and our Board of Directors has requested that we now incorporate in the Commonwealth of Massachusetts under the name of MSV, Inc. This will take place within a few weeks, so please adjust your records.

The June 30, 1985 six month financial statements prepared by the company's certified public accountants are conclusive on the occurrence of the transfer and assumption. These statements, consisting of a balance sheet and an income statement, are entitled "MSV, Inc. d/b/a Martin Specialty Vehicles, Inc." The balance sheet contains a note stating in part: "The Company was established January 4, 1985. The working assets and liabilities of the previously operated affiliate were transferred to the Company at that date." The note goes on to give the details of the assets transferred and the liabilities assumed.

In September of 1985, a person who represented himself to be the business agent for a rock group named "Guifreia" contacted Strahs. That person, who ultimately proved to be an imposter, said he wanted to purchase a musician's coach constructed on a specific chassis manufactured by the Eagle Company. Strahs mailed out a sales contract that was returned signed. Strahs sent the original of the contract to the Bank. On September 30, 1985, the Bank loaned MSV $105,000, the sum needed to purchase the Eagle chassis, by depositing this sum in the MSV account. Immediately thereafter, pursuant to the agreement of the parties, the Bank withdrew $91,422 of the loan proceeds from MSV's account in order to pay the amount due in connection with the floor planning of several other vehicles.

When several days had passed and MSV had not received the deposit it required on the sale of the Eagle bus, Strahs made a number of telephone calls and discovered that the individual he spoke with was not Guifreia's agent and that the group did not desire the bus. Neither the identity of the person who perpetrated this deception nor the reason for it has since come to light. Strahs immediately contacted a customer who had previously purchased musician coaches, and obtained that customer's agreement to purchase a less expensive bus for $108,000. In order to fulfill this order, MSV bought a coach manufactured by General Motors Corporation ("GMC") which cost only $10,000 because it was a stripped-down version without the accessories of the Eagle coach. Strahs then contacted Kevin Hourihan ("Hourihan"), the bank officer in charge of MSV's floor planning, and told him of the deception and of MSV's ability to obtain another sale at a lesser price. On October 9, 1985, MSV signed and sent to Hourihan a floor plan security agreement for the GMC bus with a note that it was in substitution for the Eagle bus. The Bank was aware that MSV had purchased the GMC bus rather than the Eagle bus. When MSV purchased the GMC bus, it sent the Bank the original purchase contract.

By mid-October of 1985, Martin and Strahs became dissatisfied with the mechanics of the floor plan form of financing, and decided to request a change to a line of credit not directly connected with the purchase and sale of vehicles. The Bank also expressed interest in such a change because it believed by law that it could only floor plan a business which was licensed as a dealer; MSV was not so licensed. MSV therefore applied to the Bank for a line of credit in the initial maximum amount of $50,000. Martin and Strahs intended this to be an interim measure only; floor plan debt was then over $100,000. The application was made with Edward Sylvia ("Sylvia"), the individual who had replaced Lucas as the loan officer in charge of the company's loans outside of the floor plan. Sylvia said he would process the application but that he needed the June 30, 1985 six-month financial statements before the application could be formally considered. MSV's accountant completed these statements on November 27, 1985, and MSV delivered them to Sylvia shortly thereafter. During December and early January, Martin and Strahs asked Sylvia several times about the status of the loan application. Sylvia told them each time that the matter was in process but that it would be necessary to prepare the new documentation needed by reason of the transfer of assets from Specialty to MSV, referring specifically to the need to prepare and file new financing statements against MSV under the Uniform Commercial Code. Sylvia and a lawyer for the Bank were then working on such documentation.

A Mr. Gustafson ("Gustafson") was Sylvia's immediate superior in the Bank's commercial loan department. In early January of 1986, the Bank's loan review officer, Zachary Everett ("Everett"), and his assistant, Donald Johnson ("Johnson"), became involved for the first time with MSV. The function of Everett and Johnson at the Bank was to deal with troubled loans, by either foreclosing upon them or by collecting them in a so-called "workout" where part or all of the debt is paid over a period of time. The reason for their involvement with MSV will be discussed later.

On Friday, January 10, 1986, Sylvia, Gustafson, and Everett visited MSV's plant. Sylvia introduced Gustafson and Everett as members of the Bank's loan committee who wished to view the premises in consideration of the pending loan application. They toured the plant, which then contained two chassis being worked upon, the GMC bus and a 1984 Corvette van. Martin discussed with Everett the need to purchase additional materials for equipping the bus, and they spoke briefly of possible loans for the purchase of such material. Everett asked Martin for a copy of the purchase contract on the bus, saying the Bank's files did not contain one, and Martin promised to deliver this to him. Everett also asked Martin for other documents, including current financial statements, cash flow projections, and a list of materials needed for completion of the bus. Martin promised to deliver them forthwith. The meeting of January 10th was a friendly one, with no allegations of loan defaults or intimations of possible foreclosure. The Bank representatives never questioned why the GMC bus was there rather than the Eagle bus which MSV had previously planned to purchase.

On the following Monday, January 13th, Strahs delivered to Sylvia the documents requested by Everett. In response to Strahs's inquiry, Sylvia said that the prospects for approval of the $50,000 credit line looked bright, and that he was waiting for Everett's approval. The closing on the loan had been previously scheduled for that day, and Sylvia apologized for the delay, stating that it was necessary to have all the internal approvals required by bank procedure.

On Tuesday, January 14, 1986, four representatives of the Bank appeared at MSV's plant—Everett, Johnson, an attorney by the name of Swords, and a deputy sheriff. They were accompanied by a locksmith. Martin was not then in the plant. They informed the employees present that they were closing the business and proceeded to change the locks. When Martin arrived a few minutes later, Swords told her they were closing the business. Johnson said the Bank was taking this action because of arrearages in loans. Johnson then handed her a letter, dated January 14th, signed by him and addressed to her as president of Specialty, in which the Bank 'demanded payment in full of three debts in the total sum of $152,308. The three debts referred to in the letter were the current floor debt of $123,733, and the balance due under two notes outside the floor plan, a note dated September 26, 1984 and a note dated February 12, 1985. Only one of the debts, the floor plan, was referred to as past due; this was described as "[P]ast due since November 1985." Martin denied that MSV's loans were in default and said there must be some mistake. She asked what she could do. Johnson informed her the only thing that could be done was to pay all loans in full. She and the other employees were told they had a few minutes to remove their personal belongings. Martin placed a telephone call to Strahs; she and Strahs agreed that they would try to straighten the matter out by talking to Sylvia and Hourihan, the loan officers with whom they had been dealing. Martin and the others then left, and the deputy sheriff padlocked the plant. The Bank again never questioned the presence of the GMC bus rather than the Eagle bus. The only reason given for the foreclosure was the arrearage in loan payments. Strahs spoke later that day with Hourihan, and Martin spoke with Sylvia. Both loan officers professed surprise at what was going on, and said they knew nothing about the foreclosure.

On the day before foreclosure, January 13th, MSV made a final payment of $250 to pay in full a $15,000 demand note. On the day of foreclosure, MSV had the following loans with the Bank with these approximate principal balances:

| Loan | Balance |
| --- | --- |
| $40,000 demand note of 9/26/84 | $ 25,000 |
| $ 6,600 demand note of 2/12/85 | 3,000 |
| Demand debt under floor plan | 123,700 |
| Total | $151,700 |

Although all these promissory notes, including the notes under the floor plan, stated that they were payable on demand, MSV and the Bank orally agreed that each debt would be paid through installments of prin-

cipal and interest. Johnson testified, and the Court so finds, that on January 14th amortization payments were current under the $40,000 note and under the $6,600 note, payments having been made on the $40,000 note on December 26th and on the $6,600 note on December 12th. Everett testified that shortly before January 14th he was told by someone in "operations" that these loans were in default. The Bank conceded at trial, and the Court so finds, that these two loans were not then in default. With respect to the advances under the floor plan, the parties agreed that interest only was payable during the first 90 days after an advance. On the 90th day, MSV was required to begin making monthly payments of principal (called "curtailment" payments) equal to 10% of the advance. The full principal balance of an advance would become due upon the sale of the vehicle that formed the basis of the original advance. Interest and principal payments on the floor plan were due on the 15th day of each month.

The Bank asserted on the day of foreclosure, and it maintained at trial, that the interest payment under the floor plan "for November," which was due December 15th, had not been paid. This was denied by the Debtor, and no written evidence was offered by either party on the question. But it seems obvious, for three reasons, that on January 14th no default existed in the required interest payments under the floor plan. First, the normal practice of the Bank, consented to by MSV, was to charge MSV's account for all payments of both interest and principal. Thus it was fully within the Bank's power to obtain the interest payment in question; MSV's account was more than sufficient to cover the payment on December 15. Second, in December the Bank paid itself a principal payment of $12,580 under the floor plan by charging MSV's account. When Martin spoke to Sylvia objecting to the amount of this charge, Sylvia had the floor plan department reverse the charge, which was done on December 31st. Finally, prior to foreclosing, neither Everett nor Johnson spoke to Hourihan, the Bank officer handling MSV's floor plan financing. Everett

claimed only that he spoke with "a lady in the floor plan department" who told him that the floor plan debt was past due more than ten days. He said he did this at about the same time that he was told by people in "operations" that the other two loans were past due.

Beginning on January 15th, and continuing for three days, Martin, Strahs and Tranghese had a series of meetings with Everett at the Bank. At the first meeting, Everett said to Tranghese: "We both know what the problem is." He did not elaborate further. Everett informed them that in order for the company to reopen, it must make up all arrearages on loans and take Tranghese's name off any loan. He asked them to complete and sign updated personal financial statements. Martin and Strahs did so; Tranghese declined. During one of the sessions, Everett met with Tranghese alone. At a later meeting that day, Everett told them that Tranghese's interest as a stockholder would have to be terminated. He also said that unless Strahs and his wife mortgaged their home to secure the Bank's debt, MSV would have to obtain financing elsewhere. At the final meeting, Strahs informed the Bank that he was not willing to mortgage his home. Martin, Strahs and Tranghese did agree to terminate Tranghese's ownership interest in MSV, and Tranghese later released his interest for no consideration. At no time during any of these meetings did a representative of the Bank assert that the reason for the foreclosure was that the GMC bus rather than the Eagle bus was on the floor plan. The only reason given for the foreclosure was the alleged arrearage in payments.

MSV has never re-opened its doors. The Bank has sold all its tangible assets, and the sales proceeds are being held in escrow pending adjudication of the rights of the parties. It is highly unlikely that MSV will ever go back into business, whether or not it recovers damages in this action. MSV has never proposed a plan of reorganization during the over two years it has been a Chapter 11 debtor before this Court. Mar-

tin and Strahs have since obtained employment elsewhere.

The foregoing sets forth the Court's principal findings of subsidiary fact. To a great extent they are based upon the testimony on behalf of the Plaintiffs, which the Court finds more credible than conflicting testimony on behalf of the Defendant. Additional findings shall be made in the discussion of the governing legal principles.

## III. VALIDITY OF BANK'S SECURITY INTERESTS

### A. *Termination of Security Interests Under U.C.C. § 9–306(2)*

MSV first contends that the foreclosure was wrongful because the Bank had previously lost its security interest when the assets were transferred from Specialty to MSV. MSV relies upon § 9–306(2)[3] of the Uniform Commercial Code, enacted in Massachusetts as Mass.Gen.L. ch. 106, § 9–306(2). It argues that the transfer was "authorized" by the Bank within the meaning of § 9–306(2), so that the statute's requirements for continuity of the security interest have not been met. The wording of § 9–306(2), says MSV, is controlling over the somewhat inconsistent provisions of U.C.C. § 9–402(7), enacted as Mass.Gen.L. ch. 106, § 9–402(7).[4]

The Bank argues that there has been no transfer because no bill of sale was signed and no vote of Specialty's board of directors was passed authorizing the transfer. As previously found and ruled, the assets were transferred through the conduct of the parties. All officers and directors of both corporations treated the transfer as having taken place. It would be ludicrous for the court not to do so also.

The Bank is nevertheless entitled to prevail on this issue because the transfer was not "authorized" by it within the meaning of § 9–306(2). There is a division of opinion in the interpretation of this statute. Several decisions, and in our opinion the better reasoned ones, hold that a transfer of collateral is not "authorized" under § 9–306(2) if the secured party consents to the transaction on the condition that its security interest continues after transfer. *See, e.g., Wegner v. Grunewaldt,* 821 F.2d 1317, 1320–22 (8th Cir.1987); *Loeb v. Franchise Distributors, Inc. (In re Franchise Systems, Inc.),* 46 B.R. 158 (Bankr.N.D.Ga. 1985); *Richmond Fixture & Equipment Co. v. Hyman (In re Southern Properties, Inc.),* 44 B.R. 838 (Bankr.E.D.Va.1984). These courts believe that treating such conditional consent as authorization under § 9–306(2) is highly artificial because to do so would give effect to one aspect of the consent while ignoring the other. They reconcile § 9–306(2) with § 9–402(7) by construing the latter as applying only to such conditional authorization. Other decisions arrive at the opposite result. Some do so because the lien is hidden after the conditional transfer from a potential creditor examining the records unless the record search includes the collateral's entire chain of title. *See, e.g., Trustee Services Corp. v. East River Lumber Co., Inc. (In re Hodge Forest Industries, Inc.),* 59 B.R. 801 (Bankr.D.Idaho 1986). But Official Comment No. 8 to U.C.C. § 9–402 anticipates the necessity of searching the entire chain of title. *See* Mass.Gen.L. ch. 106, § 9–402 comment 8. A construction of § 9–306(2) as excluding such conditional assent from its operation and of § 9–402(7) as referring to such assent, therefore, not only puts the two statutes in harmony, but is also consistent with Official Comment 8 to § 9–402. This type of conditional consent should be distinguished from the situation where the secured party permits a sale on the condi-

---

3. Mass.Gen.L. ch. 106, § 9–306(2) reads:
   (2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

4. Mass.Gen.L. ch. 106, § 9–402(7) reads in pertinent part as follows:
   A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

tion that it be paid from the proceeds. There the condition relates to an event occurring after the transfer so that it can be logically separated from the consent. *See, e.g., Moffat County State Bank v. Producers Livestock Association*, 598 F.Supp. 1562 (D.Colo.1984).

We conclude that the Bank's consent to the transfer of assets from Specialty to MSV was a conditional authorization outside of the authorization referred to in § 9–306(2). In suggesting, and later consenting to, the formation of a Massachusetts corporation, the Bank envisioned a corporation which would receive and hold the business assets subject to its security interest. Thus its consent should be viewed in the same category as the consent *to a transfer of assets to an unrelated party subject to the security interest.* It is true that the Bank, in the persons of Sylvia and its attorney, intended to have new documents executed and filed under the name of MSV. But that intention is certainly not inconsistent with the conditional nature of the Bank's authorization. Even one versed in the law would be well advised to require new documentation, particularly in view of the division of authority concerning the effect of conditional consent under § 9–306(2).

■ We do not rest our decision on the provision contained in the Bank's various security agreements prohibiting transfer of collateral without the prior written consent of the Bank. Section 9–306(2) terminates the security interest if "the disposition was authorized by the secured party in the security agreement *or otherwise.*" (emphasis supplied). If the Bank's consent to the transfer was unconditional, which it was not, it would have "otherwise" consented. *See Moffat County State Bank v. Producers Livestock Marketing Association*, 598 F.Supp. 1562 (D.Colo.1984).

■ The Bank's security interest is not voided by application of bulk transfer law

(Mass.Gen.L. ch. 106, § 6–101 *et seq.*) to the transfer of assets from Specialty to MSV. Bulk transfer law is concerned with the ability of a creditor to attach or levy upon the property transferred in the hands of the transferee. *See* Mass.Gen.L. ch. 106, §§ 6–104 comment 2, 6–110. Here the Bank claims a security interest in the property prior to the transfer. And even if bulk transfer law had application here, its six-month statute of limitations had expired prior to the Bank's seizure. *See* Mass.Gen. L. ch. 106, § 6–110. Neither Specialty nor MSV concealed the transfer, so there was no tolling of the limitations period.

■ The second sentence of U.C.C. § 9–402(7) [5] (Mass.Gen.L. ch. 106, § 9–402(7)) gives us no guidance in construing § 9–306(2). What occurred here may have been a change in "corporate structure" within the meaning of this second sentence. But unlike the sentence in § 9–402(7) previously discussed, the application of the second sentence entirely depends upon a consideration which is only relevant to financing statements, the misleading nature of a previous filing under another name. And, of course, § 9–402(7) is in no sense controlling because it pertains only to perfection of a security interest, not its enforceability against the debtor. As more fully discussed below, we are concerned with enforceability of the Bank's security interest against the debtor, not the perfection of the security interest against third parties.

### B. *Independent Grant of Security Interests by MSV*

■ There is another reason to conclude that at the time of the foreclosure the Bank had an enforceable security interest in all of the assets of MSV. A security interest attaches, and is enforceable against a debtor, upon the occurrence of three events: (1) the debtor signing a security agreement containing a description of the collateral;

---

**5.** This sentence reads:
   Where the debtor changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is

not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time.

(2) the giving of value; and (3) the debtor acquiring rights in the collateral. Mass. Gen.L. ch. 106, § 9–203(1). The filing of financing statements signed by the debtor merely perfects the security interest so as to prevent it from becoming subordinate to the rights held by third parties in the collateral. Mass.Gen.L. ch. 106, § 9–301.

MSV had rights in the collateral as the result of the transfer, and the Bank certainly gave value in its loans. MSV also signed the requisite security agreement covering all the property foreclosed upon by the Bank. At the time of foreclosure, MSV had only two chassis in inventory, the GMC bus and the 1984 Corvette Van. It had signed and delivered to the Bank separate security agreements covering each chassis, one dated October 9, 1985 for the GMC bus and one dated October 2, 1985 for the Corvette. Although Martin signed these security agreements in the name of Specialty, she signed in this manner only at the request of Hourihan who asked her to sign in the same manner as before. Most important, it is clear that Martin intended to sign on behalf of MSV and was using the name of Specialty only as a trade name. As previously discussed, the June 30, 1985 financial statements, the notice of intent to dissolve filed on behalf of Specialty, and the letter sent a year before to customers all make it clear that MSV and not Specialty was then the operating corporation. Those financial statements also indicate that MSV used the name of Specialty as a trade name.

The equipment on the premises at the time of foreclosure was also covered by a security agreement signed on behalf of MSV. Unlike the vehicles, there was no security agreement covering the equipment signed after the incorporation of MSV. But MSV's accountant signed MSV's draft financial statements of June 30, 1985 which affirmed the validity of all of the Bank's security interests granted by Specialty under prior security agreements. The officers of MSV ratified these draft financial statements through the act of delivering them to the Bank. This affirmation of the prior security agreements is equivalent to signing a new security agreement.

## IV. ABSENCE OF DEFAULT

The Bank had the right to take possession of MSV's assets only upon the occurrence of a default under one or more of its security agreements. Mass.Gen.L. ch. 106, §§ 9–501, 9–503. The Bank's security agreement of February 27, 1981, which granted it an all-encompassing security interest to secure all present and future debt, includes as an event of default the failure to pay any obligation owed the Bank by the borrower (then Specialty) or by any guarantor of the borrower's obligations. Other security agreements between the parties contain the same or similar terms.

As has been previously found, MSV was not then in default in any installment of interest or principal. Moreover, the one month's arrearage in interest claimed by the Bank would not be a material breach giving right to acceleration, in view of the fact that the Bank had the right to withdraw the funds from MSV's account. *See Sahadi v. Continental Illinois National Bank & Trust Co.,* 706 F.2d 193 (7th Cir.1983). Even if we consider these promissory notes as true demand instruments (and, as discussed below, we conclude they are not), the Bank made no demand for payment prior to commencing foreclosure. When it entered the premises, it merely announced that it was foreclosing and began changing the locks. Nor could it have made an effective demand for payment upon entry, because no officer of MSV was then present. It was not until Martin arrived that the Bank made demand. It is of course true that a cause of action accrues on a demand obligation immediately on its date of issue. Mass.Gen. L. ch. 106, § 3–122(1)(b). But the word "default" is defined as "the omission or failure to perform a legal act or contractual duty." *Black's Law Dictionary* 376 (5th ed. 1979). We do not construe the Bank's printed form of security agreements, which it drafted, to mean that the maker of a demand note is to be considered as having failed to perform his obligation *ab initio,* without any demand for payment having been made upon him. Thus even if these

notes are considered demand instruments, and even assuming that MSV would have been in default upon failure to pay them instantly upon demand, MSV was not in default when the Bank commenced foreclosure.

■ In any event, the Bank's notes were in legal effect time instruments rather than demand instruments. The parties had an agreement for payment of the notes over a period of time. The notes, as well as the Bank's security agreements, list various events of default which give the Bank the right to elect to have all debt "immediately due and payable." These circumstances establish that the notes were not true demand instruments. *Reid v. Key Bank of Southern Maine, Inc.*, 821 F.2d 9, 14 (1st Cir.1987). As time instruments with due dates that remained unaccelerated, they were not due and payable at the time of foreclosure, much less in default.

■ The Bank argues that MSV was in default prior to foreclosure because the $160,000 mortgage note signed by the stockholders, and guaranteed by MSV, was then a few months in arrears. The stockholders were indeed then in default in these monthly installments, which under the terms of the note made the full amount due "at the Holder's option." But MSV was not then in default under its guaranty. The guaranty of Specialty, assumed by MSV, states: "Upon any default by the Customer in the full and punctual payment and performance of the Obligations, the liabilities and obligations of the Guarantor hereunder shall, at the option of the Bank, become forthwith due and payable to the Bank without demand or notice of any nature, all of which are expressly waived by the Guarantor." On the day of foreclosure, however, the Bank had not elected to exercise its "option" to declare MSV or Specialty liable under Specialty's guaranty of the mortgage note. By Everett's own admission, and as disclosed in the demand letter of January 14th, the Bank on that date was not proceeding to collect on the $160,000 mortgage note. We find that the Bank on that date had not elected to exercise its option to have the guarantor's obligation immediately due and payable.

■ What appears to be the Bank's principal argument concerning default is related to its security rather than MSV's alleged failure to make any payment. The Bank claims that the Debtor defrauded it by substituting the GMC bus for the Eagle bus. But there was no deception of the Bank by MSV, only deception of MSV by some unknown party. As soon as MSV discovered this, it notified the Bank of the problem, and delivered a new security agreement dated October 9, 1985 covering the GMC bus. Martin wrote a note to Hourihan on that security agreement stating: "Kevin this is the new note agreement about the change of Eagle to GMC. Please refer to our letter of change 10/3/85." Thus the Bank was made immediately aware of the problem in October, and took no action. Perhaps its lack of action was due to the fact that of the $105,000 advanced on the Eagle bus, the Bank immediately received $91,442 back as payment on other loans. Moreover, it is clear that even on January 14th the Bank was not acting by reason of any alleged default in connection with the bus. Its representatives made no mention of the substitution of the GMC bus for the Eagle bus at any of the meetings held with MSV, beginning with the meeting at the plant on January 10th and continuing through the three days of meetings following the foreclosure. Long before foreclosure, therefore, the Bank was estopped from claiming any default in connection with the bus. And any such default was cured by the substitution by the new security agreement covering the GMC bus. Moreover, because the parties had a practice of adding vehicles to the floor plan prior to their actual purchase, no default existed in the first place.

## V. THE BANK'S BAD FAITH

### A. *The Obligation of Good Faith*

The Bank owed MSV more than an obligation to await a default before taking possession. The common law and statutes of Massachusetts required it to use good faith in all of its dealings with MSV, wheth-

er or not any defaults existed under its security agreements. Section 1–203 of the Uniform Commercial Code, enacted in Massachusetts as Mass.Gen.L. ch. 106, § 1–203, provides: "Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement." The violation of this obligation gives a cause of action. Mass.Gen.L. ch. 106, § 1–106(2); *Reid v. Key Bank of Southern Maine, Inc.*, 821 F.2d 9, 12 (1st Cir.1987). *But see Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp. 666, 677 (N.D.Ga.1982), *aff'd* 747 F.2d 708 (11th Cir.1984).

■ Although we have been directed to no decision in which the Supreme Judicial Court of Massachusetts has applied §§ 1–203 and 1–106(2) to give a cause of action against a lender acting in bad faith, we have no doubt that it would do so. In *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977), the court concluded in part from § 1–203 that good faith and fair dealing are pervasive requirements in our law, and held an employer liable in damages for the bad faith termination of an employment at will contract. The court also relied on the requirement of good faith and fair dealing now contained in *Restatement (Second) of Contracts* § 205, as well as on the mandate against bad faith revocation of an offer of compensation contained in *Restatement (Second) of Agency* § 454. *See Fortune v. National Cash Register*, 373 Mass. at 104–05, 364 N.E.2d at 1257. We conclude, therefore, that the Massachusetts Court would require the Bank to use good faith in the enforcement of its loan documents, both because of the Code's good faith requirement and as a matter of general contract law. The court of appeals for this circuit came to the same conclusion concerning the law of Maine in *Reid*. *See Reid v. Key Bank of Southern Maine, supra*, at 12–13. A number of courts have imposed an obligation of good faith upon lenders. *See, e.g., K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985); *Carrico v. Delp*, 141 Ill.App.3d 684, 95 Ill.Dec. 880, 490 N.E.2d 972 (1986); *First National Bank in Libby v. Twombly*, 689 P.2d 1226, 39 U.C.C.Rep.Serv. (Callaghan) 1192 (Mont.1984).

■ The provisions in the notes stating that they are payable on demand do not remove the obligation of good faith. The Bank argues that the comment to U.C.C. § 1–208 [6] governing options to accelerate at will removes any obligation of good faith in the enforcement of a demand instrument, citing the opinion of the district court in *Spencer Companies, Inc. v. Chase Manhattan Bank N.A.*, 81 B.R. 194 (D.Mass. 1987). But the *Spencer* decision is not controlling here, quite aside from any question concerning the efficacy of a draftsmen's comment which conflicts with apparently clear statutory language elsewhere. Because these instruments are not true demand instruments, considerations which may be applicable to demand instruments do not defeat the obligation of good faith imposed on the Bank. *Reid v. Key Bank of Southern Maine, supra*, at 14. Nor do we see any reason to believe that the Massachusetts court would distinguish between the demand note involved here and the employment at will contract involved in *Fortune v. National Cash Register Co., supra*.

■ We also believe that the Supreme Judicial Court of Massachusetts would hold that an action arises from a lender's bad faith conduct whether that conduct is considered in bad faith under a subjective or

---

**6.** U.C.C. § 1–208 provides:

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

The comment to § 1–208 includes this observation:

Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason. This section applies only to an agreement or to paper which in the first instance is payable at a future date.

an objective standard. The Uniform Commercial Code contains two definitions of good faith, one that applies generally and one that applies only to merchants. Mass. Gen.L. ch. 106, § 1–201(19) states: " 'Good faith' means honesty in fact in the conduct or transaction concerned." Mass.Gen.L. ch. 106, § 2–103(b) provides: " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Although the § 1–201(19) definition seems to point toward the subjective, the First Circuit observed in *Reid* that there is authority such as *K.M.C. Co. v. Irving Trust Co., supra,* which construes § 1–203 as including an objective element. *Reid v. Key Bank of Southern Maine, supra,* at 15 & n. 2. The *Fortune* decision indicates that the Supreme Judicial Court of Massachusetts would apply an objective standard under general contract law. The court's holding of bad faith there was not based upon the employer's deceit or lack of candor in connection with the employment termination, but rather upon the unfairness in terminating an employment at will when the employee was on the brink of successfully completing a sale which would entitle him to a full commission. *Fortune v. National Cash Register Co., supra,* 373 Mass. at 102–05, 364 N.E.2d at 1256–57. *See Zapatha v. Dairy Mart, Inc.,* 381 Mass. 284, 408 N.E.2d 1370 (1980); *see also Gram v. Liberty Mutual Insurance Co.,* 384 Mass. 659, 667, 429 N.E.2d 21, 26 (1981) ("We have ... recognized that good faith in the termination of the contractual relationship may require more than simply adhering to the requirement of good faith as defined in the Uniform Commercial Code"). We believe that in passing upon what occurred here the Massachusetts court would examine the fairness of the Bank's conduct as well as its honesty.

The issue of an objective vis-a-vis subjective standard is largely academic here. Although the Bank's dealings with MSV were objectively oppressive and unfair for a number of reasons, in many respects its conduct was also deceitful and downright dishonest.

## B. *Findings of Bank's Bad Faith*

■■■ The Court finds and rules that the Bank acted in bad faith in the following respects when it foreclosed upon MSV's property:

1. During the period January 10, 1986 through January 13, 1986, the Bank pretended to be considering MSV's loan request when, in fact it had already decided to foreclose. *See Skeels v. Universal C.I.T. Credit Corp.,* 335 F.2d 846 (3rd Cir. 1964).

2. The Bank made no demand for payment prior to foreclosing.

3. The Bank gave MSV no opportunity to find another financing source prior to foreclosing.

4. The Bank made no attempt to investigate adequately the existence of payment defaults.

5. The Bank was aware that no default then existed in the payment of MSV's obligations.

6. The only default the Bank alleged to exist at foreclosure was a minor default in interest, and the Bank had it within its power to withdraw this amount from MSV's account.

7. The Bank's true motive for foreclosing was its desire to terminate all connections with Tranghese.

8. After foreclosure, the Bank pretended to be willing to reconsider financing MSV if Tranghese ceased being a stockholder and if Strahs and his wife mortgaged their home as security, whereas it intended all along to complete the foreclosure process regardless of these matters.

9. After the foreclosure, the Bank pretended that it had foreclosed because of alleged fraud in the change from the Eagle bus to the GMC bus, whereas the change in buses had nothing to do with its decision to foreclose.

Although we find that severance of all connections with Tranghese was the Bank's true motive for foreclosing (apparently prompted by recent adverse publicity concerning so-called "money laundering" by

the Bank), our other findings of bad faith do not depend upon this motive. The Bank acted irrationally and unfairly. Its action was in objective bad faith whether motivated by its desire to cut all relations with Tranghese or by some other hidden agenda, or whether it had no motive for its actions whatsoever. And its lack of candor concerning its intentions, a part of the subjective aspect of its bad faith, was present regardless of any ulterior motivation.

## VI. DAMAGES

■ The Bank's foreclosure was, therefore, a breach of its contractual obligations in two respects. The foreclosure violated both the Bank's implied covenant of good faith and its obligation to take possession and dispose of collateral only upon the occurrence of a default under its security agreements. Its action has caused the loss of MSV's entire business; MSV is therefore entitled to be compensated for that loss under basic contractual principles. *See Restatement (Second) of Contracts* § 347. The measure of damages for the loss of property brought about by the disposition of the property in violation of a contract is the property's fair market value. *Mechanics Bank of Worcester v. Killeen*, 377 Mass. 100, 384 N.E.2d 1231 (1979); *Hall v. Paine*, 224 Mass. 62, 112 N.E. 153 (1916). Where, as here, a remedy under the contract is adequate, there is no occasion to determine the award of tort damages. *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977).

MSV argues that the measure of damages should be its lost profits, a traditional remedy in contract law. It offered expert testimony through Howard J. Gordon ("Gordon"), an investment banker, that the present discounted value of its lost profits is $1,249,000. Where a contract is breached, it is of course proper to award the innocent party the profits he would have made under the contract. *Restatement (Second) of Contracts* § 347. Lost profits are also an appropriate measure of damages in a business tort case where a wrongful act causes a dimunition in profits. *Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.*, 14 Mass.App.Ct. 396, 426, 440 N.E.2d 29, 48 (1982). But MSV's loan and security agreement are not the type of contractual arrangements which of themselves give rise to a profit. Nevertheless, where a breach of contract causes an entire suspension in operations, it is appropriate to award the profits that would have been earned during the period of suspension. *Narragansett Amusement Co. v. Riverside Park Amusement Co.*, 260 Mass. 265, 281, 157 N.E. 532, 536 (1927); *see Restatement (Second) of Contracts* § 352 comment b. Here, however, MSV's business has been entirely destroyed. Its loss of profits from that business cannot exceed the value of the business itself. Although projected future profits are relevant to that value, they are relevant not as the controlling measure of damages but rather an important factor in the determination of value. *Aetna Life & Casualty Co. v. Little*, 384 So.2d 213 (Fla.1980); *Jim's Hot Shot Service, Inc. v. Continental Western Insurance Co.*, 353 N.W.2d 279 (N.D.1984); *Sawyer v. Fitts*, 630 S.W. 2d 872 (Tex.1982).

■ Gordon, MSV's expert, also opined on the value of MSV's business. He was of the opinion that its fair market value was $713,905. The Bank's expert was John H. Kelleher ("Kelleher"), a certified public accountant. Kelleher was of the opinion that the value of the business was zero. Of the two experts, Gordon clearly is the more credible. His experience in the valuation of businesses and his knowledge of the subject were far greater than that of Kelleher, whose experience and knowledge did not exceed that of any certified public accountant. Indeed, Kelleher's formal education on the subject was limited to courses of the type that Gordon taught and which Kelleher was required to take in order to maintain his certificate. Kelleher's analysis, moreover, leaves much to be desired. He arrived at his opinion of a zero value (an opinion which is incredible in itself) largely because of MSV's condition at the time of its Chapter 11 filing. This is circular reasoning to the extreme.

Gordon relied primarily upon projected future profits in arriving at his opinion of value. He testified, and the court so finds, that this is an appropriate technique to use in determining the value of a business. It is particularly appropriate where, as here, the business is young and there are objective indications of increasing profits in the future. In response to questions from the Court, Gordon readily conceded that other approaches to valuation put greater emphasis upon historic profit levels. The Bank, however, offered into evidence no other valuation technique, except for Kelleher's woefully inadequate testimony.

■■ The Bank charges that Gordon's testimony was built upon speculation. But a proper foundation was laid for all the projections he used. We conclude that MSV has established its damages with reasonable certainty. MSV's proof of damages is far different from the evidence involved where a speculative new enterprise has been prevented from going into operation. There the circumstances may not permit proof of a loss of profits with reasonable certainty. *See Rosenberg v. Latif (In re Phoenix Restoration Specialists, Inc.)*, 14 B.R. 115, 123–24 (Bankr.D. Mass.1981); *Restatement (Second) of Contracts* § 352 illustration 2; *see also* Annotation, *Recovery of Anticipated Lost Profits of New Business: Post 1965 Cases*, 55 A.L.R. 4th 507 (1987). Here MSV had a track record of profits, and there was evidence supporting the conclusion that its profits would increase substantially in the future.

The Court therefore finds damages in the sum of $713,905.

## VII. SUBORDINATION

■■ MSV also asks that the Bank's debt be subordinated to the debts of all other creditors, and possibly to the interests of its stockholders, under principles of equitable subordination pursuant to 11 U.S. C. § 510(c). The Bank argues that this is not a proper case for equitable subordination because the doctrine is confined to debts owed to insiders, typically stockholders who are guilty of inequitable misconduct. But the doctrine is not that restrictive. One who is not an insider or in control may still have his debt subordinated if he is guilty of substantial misconduct involving moral turpitude or fraud, overreaching or spoilation. *Bank of New Richmond v. Production Credit Association (In re Osborne)*, 42 B.R. 988, 996–97 (W.D. Wis.1984); *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.)*, 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983). The Bank is certainly guilty of such misconduct.

The Court nevertheless declines to subordinate the Bank's claim to the claims of creditors or the interests of stockholders. The doctrine of equitable subordination should be applied only to the extent necessary to offset the harm caused by the misconduct. *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 701 (5th Cir.1977). We have already determined the amount of damages, and a judgment against the Bank in that amount is certainly an adequate remedy. To subordinate the Bank's debt in addition to this remedy would grant MSV a windfall.

## VIII. REMEDY

■■ The Bank is entitled to setoff the amount of its debt against MSV's damages of $713,905.00. MSV owed the Bank the sum of $152,308.00 on January 14, 1986. Deducting this from MSV's damages, the net sum due MSV is $561,597.00.

Judgment has been entered against the Bank in favor of MSV in the sum of $561,-597.00, with interest and costs. The judgment also orders the Bank to release its interest in the escrowed auction proceeds as partial satisfaction. The Bank is ordered as well to release any encumbrance it has upon the property of Martin (and any co-owners with Martin) to the extent the encumbrance secures any debt owed it by MSV and guaranteed by Martin, which debt is non-existent because of the setoff. Martin is entitled to no other relief; her interest as a stockholder of MSV is protected by the judgment in its favor. Special-

ty's claim is dismissed in view of its prior transfer of the business.